Rachael LESSARD, et al., Plaintiffs,

v.

**CITY OF ALLEN PARK,**
et al., Defendants.

Larry Page, et al., Plaintiffs,

v.

City of Inkster, et al., Defendants.

Nos. 00–74306, 87–70992,
00–75626, 77–71100.

United States District Court,
E.D. Michigan,
Southern Division.

Feb. 25, 2003.

Peter W. Macuga, II, Steven D. Liddle, Macuga & Liddle, Detroit, MI, for Plaintiffs.

Kenneth A. Slusser, Johnson, Rosati, Farmington Hills, MI, R. Craig Hupp, Kurt M. Btauer, Bodman, Longley, Detroit, MI, Thomas A. Bengtson, Geoffrey H. Seidlein, Stacy L. Hissong, Hubbard, Fox, Lansing, MI, Edward D. Plato, Secrest, Wardle, Farmington Hills, MI, for Defendants.

## OPINION AND ORDER REGARDING FEDERAL SUBJECT MATTER JURISDICTION

FEIKENS, District Judge.

### I. INTRODUCTION

Basement flooding plaintiffs in *Bray* (00–74510), *Ellison* (02–71571), *Garcia* (02–72168), *Achatz* (02–72201), *Lessard* (00–74306), *Abraham* (02–72042), *Frank* (00–74496), *Booker* (02–72601), *Stewart* (00–74885), *Allard* (02–72068), *Page* (00–75626), *Adkins* (02–71882), *Radar* (00–74440), *Jellen* (00–74487), *Porath* (02–72200), *Angell* (02–72102), *Taylor* (00–74747), and *Grande* (02–71113), *Swann* (02–71486), *Edwards* (02–71444), *Stephenson* (02–71522), *Hernandez* (02–71523), *Cammarata* (02–71736), and *Redmond* (01–72716) have filed renewed motions for remand and an emergency motion to the same effect for lack of subject matter jurisdiction.

Since these motions challenge subject matter jurisdiction, I regard the motions to remand as having been filed in all cases.

### II. BACKGROUND

Since 1977 I have had oversight responsibility as to water quality and pollution problems in the greater Detroit metropolitan area. That area consists principally of three major counties: Wayne, Oakland and Macomb. The City of Detroit, through its agency the Detroit Water and Sewerage Department (DWSD), furnishes water and removes wastewater from the residences and industries in this area, and the communities being served have over four-and-one-half million people.

In 1977 and in 1987, two major cases were brought by the United States Environmental Protection Agency (EPA) against both the Detroit Water and Sewerage Department (DWSD) and the communities it serves, along with Wayne County

and the communities it serves through the Wyandotte Wastewater Treatment Plant. These cases were resolved in complex consent judgments which have, over time, been amended. To explain the complex web of relationships created by these consent judgments, further reference to these cases and the consent judgments is necessary.

The case brought in 1977 by EPA against the City of Detroit and its agency, DWSD, also named all the communities, i.e., the cities and counties to which DWSD provided the service of wastewater removal. The Downriver communities [1] were named as defendants. A complex consent judgment was negotiated and approved by this court and, through this consent judgment, as amended, strict requirements have been imposed, both on DWSD and the communities that it serves.

DWSD is one of the largest governmental utilities providing water and wastewater service in the United States. In this region there is also another large wastewater treatment plant, and it serves the Downriver communities. It is known as the Wyandotte Wastewater Treatment Plant, and from that case there resulted a second complex consent judgment governing the relationships between Wayne County, the Wyandotte Treatment Plant, and the Downriver communities in the removal and treatment of wastewater. These consent judgments also directly affect the issue of subject matter jurisdiction.

It is these two consent judgments and their amendments that result from the case brought by EPA in 1977 and 1987.

The 1977 Consent Judgment (Exhibit A), filed September 14, 1977, and approved by me on that date, was amended in 1980. It is to that amendment that I now turn.

### A. The 1980 Amended Consent Judgment

The 1980 Amended Consent Judgment (Exhibit B) requires DWSD to "submit for approval a Master plan to develop and implement an Industrial Waste Pretreatment and Commercial User Control Program." (1980 Amended Consent Judgment at p.10). These industrial waste control ordinances were to be adopted by DWSD and its customer suburbs and gave DWSD the right to monitor and inspect the quality of sewage. (1980 Amended Consent Judgment at p.11). Additionally, "Each such suburban municipality or other governmental unit shall diligently enforce such ordinances. If the suburban community does not comply, Detroit has the right to bring suit to force compliance with its ordinances." (1980 Amended Consent Judgment at p.11).

One of the pervasive problems referred to in the consent judgments related to wet weather problems.

### B. Wet Weather Demonstration Project and Issuance of Regional NPDES Permit

On August 25, 1983, EPA issued National Pollution Discharge Elimination System (NPDES) Permit No. MI0022802 to DWSD. On June 8, 1984, I took judicial notice of this permit and retained jurisdiction and "full and complete power" over the resolution of yet unsatisfied requirements of the Amended Consent Judgment.

---

**1.** "Downriver communities" include the following thirteen communities or entities, plus the following two drainage districts, all of which are defendants in the 1987 case (no. 87–70992): City of Allen Park, City of Belleville, Township of Brownstown, City of Dearborn Heights, City of Ecorse, City of Lincoln Park, City of River Rouge, City of Riverview, City of Romulus, City of Southgate, City of Taylor, Township of Van Buren, City of Wyandotte, Southgate–Wyandotte Relief Drainage District, and Ecorse Creek Pollution Abatement Drain. See Consent Judgment ¶ III(3)(F),p.7.

In 1989 the Michigan Department of Natural Resources (MDNR, now the Michigan Department of Environmental Quality (MDEQ)) issued proposed NPDES permits for CSOs (Combined Sewer Overflows) serving the Rouge Valley communities, to which the communities objected. On November 7, 1989, I filed an Opinion and Order which held that I have jurisdiction to consider objections to the NPDES permit proposed by MDNR, and I took jurisdiction over the implementation of CSO standards established in the NPDES permit. This included the time and manner in which DWSD and the communities it serves meet the permit's standards. (November 7, 1989 Opinion and Order at pp.11–12) (Exhibit C). I clarified the scope of my jurisdiction in a December 21, 1989 Memorandum Opinion and Order in which I held that "I have jurisdiction over all issues involving NPDES permits regarding the time and manner in which the parties must deal with wet weather flow violations." *Id.* at 1.

In 1991, Wayne and Oakland Counties petitioned this court for declaratory relief, seeking relief from their NPDES permits. In the alternative, they petitioned me to declare that MDNR issue all NPDES permits jointly to Wayne and Oakland Counties and the particular municipalities to which they apply. I noted in my Opinion and Order of December 23, 1991, at pp.10–11, that

> There can be no doubt that the CSO problems alone now being addressed by the parties and this court are regional problems and that any effective solution to the overflow problems will involve all of the communities in each drainage or river basin in Southeastern Michigan. Nor can there be any doubt that leaving the parties to negotiate each and every permit and the means by which to comply and finance compliance with such permits has only served to elevate the political and parochial differences among

the parties above the common goal of solving the overflow problem .... The creation of a regional sewer consortium or authority would allow the parties to address issues of non-point source pollution, the coordination of discharge control measures across political boundaries, uniform financing and any other issue arising in the remedial process.

Thus, I granted Wayne and Oakland Counties' petition for declaratory relief and ordered the issuance of a regional NPDES permit.

## C. *The 1962 Contract and 1987 EPA Case*

In 1962, Wayne County and the Downriver communities contracted to establish the Downriver Sewer System to provide adequate transportation and treatment of sewage originating in the Downriver communities. *See* Downriver Sewage Disposal System Contract, March 1, 1962 (1962 Contract) (Exhibit E). The contract recognized that "[i]t is immediately necessary and imperative for the public health and welfare of the present and future residents of the above cities and townships that adequate and proper sewage disposal facilities be acquired and constructed to serve said municipalities or parts thereof lying with the district hereinafter described ...." *See* 1962 Contract at 1.

The Contract included specific provisions requiring both improvements to the existent facilities and the construction of new facilities to serve the Downriver communities. *See* 1962 Contract at Part I, Division I, *et seq.* It specified design characteristics of the sewer system, including the maximum rate of flow. It allocated this cost among the Downriver communities by percentages, and outlined its financing method through the issuance of bonds. The Contract required each community to purchase both interceptor and

wastewater treatment plan capacity from Wayne County. Each community was responsible for any sewage in excess of the purchased amount.

In 1987, EPA and MDEQ sued Wayne County and Downriver communities, charging violations of federal and state water quality laws due to the failure of the Downriver Sewer System to comply with required water quality standards. The parties thereupon entered into a consent judgment (May 1994), and accepted constant monitoring by the court to ensure their compliance.

The 1987 Consent Judgment (Exhibit F) mandated that Wayne County and the Downriver communities develop a plan to bring the Downriver Sewer System into compliance with the Clean Water Act and state law.[2] A 1994 Financing Plan and Final Judgment, entered concurrently with the Consent Judgment, outlined the financial obligations of Wayne County and the Downriver communities. *See* 1994 Financing Plan and Final Judgment (1987 Case Financing Plan) (Exhibit G). This Consent Judgment and the financing plans imposed significant financial burdens on Wayne County and the Downriver communities.

The 1987 Consent Judgment is a comprehensive agreement which outlines in detail all aspects of the operation, management and maintenance of the Downriver Sewer System. It establishes a compliance program whereby it mandated that "Defendants shall commence and complete all activities, including but not limited to planning, design, rehabilitation, contract-

ing, [and] construction, . . . and [required] performance certification by the deadlines established in this Decree." (1987 Consent Judgment at p.10). Included in the list of projects for construction were an upgrade of the Wayne County–Wyandotte Treatment Plant (at p.12), and a regional sewage storage-transport system (at pp.15–16).

The Consent Judgment also requires Wayne County and the Downriver communities to work together "to execute a careful balancing of the flow of sewage that goes into the sewer system and, in turn, to the Wyandotte Wastewater Treatment Plant."[3] This balancing required the Downriver communities and Wayne County to monitor the sewer system to make sure that the flow of sewage going into the system did not exceed the maximum amount of flow that the Wyandotte Wastewater Treatment Plant can properly process.[4] This balancing is a continuous process that is particularly important in wet weather events.

The 1987 Consent Judgment recognizes that wet weather events may create an imbalance in the system and cause sewage flow to exceed the capacity of the sewer system and the treatment plant at least until all improvements are completed in 2002.[5] It recognized that balancing millions of gallons of sewage in an imperfect science, but one which the parties pledged to tackle with their best efforts. Paragraph 10(B) provided that, "In conducting the work required by this Decree, Defendants may from time to time find it neces-

---

**2.** The Federal Water Pollution Control Act, 33 U.S.C. § 1251 et seq. (the Clean Water Act); the Michigan Water Resources Commission Act, Mich. Comp. Laws Ann. § 324.3101 et seq.; Part 31 of Michigan's National Resources and Environmental Protection Act; and the terms of National Pollution Discharge Elimination System Permit MI0021156.

**3.** See 1987 Consent Judgment, Para. 12(A).

**4.** See 1987 Consent Judgment, Para. 10(F)(i), Para. 12(L) (outlining proposed System Monitoring Program as a means to monitor flow in the sewage system).

**5.** See 1987 Consent Judgment, Para. 10(C), p.19–20.

sary to interrupt WWTP [Wastewater Treatment Plant] operations. Defendants shall make their best efforts to schedule any necessary interruptions in order to minimize the possibility and extent of any bypass or overflow, any exceedance of effluent limitations, and any adverse environmental impacts." In addition, paragraph 12(A), at p.25, provides that the "Defendants shall maintain and operate the WWTP and the Downriver Collection and Storage System to minimize equipment breakdowns, interruptions of treatment, and bypasses and overflows."

The 1987 Consent Judgment allowed Wayne County and the Downriver communities to "bypass" the system and open gates to release excess flows into the Detroit and Rouge Rivers from the system during "emergency wet weather events" until September 2002.[6] Pursuant to the Consent Judgment, other related documents have been executed between the defendants to develop both guidelines and an overall plan as to how this balancing should be operated.[7] Further, it addressed which government agencies are responsible for the operation of the "bypass gates" which control the flow of sewage through the system and to the wastewater treatment plant.[8]

It included stipulated penalties should any party breach its terms.

It also included a dispute resolution provision, which outlined a process by which the parties were required to work together to resolve any disagreements which may arise under its terms. It stated that: first, the dispute will be "the subject of informal negotiations between the Defen-

dants and Plaintiffs." (1987 Consent Judgment, Para.41 at p.46). Then, if the informal negotiations are unsuccessful, the defendants must comply with plaintiffs' position unless they file with the court a petition for resolution of the dispute within twenty days of written notice of plaintiffs' position. (1987 Consent Judgment, Para.42 at p.46).

The proper venue for dispute resolution under the Consent Judgment is this court, and I expressly retained jurisdiction in the Consent Judgment itself: "The court shall retain jurisdiction for the purpose of ruling on any motion by any party to enforce the terms and conditions of this Decree, under applicable law, until this Decree is terminated in accordance with Section XXIV below." (1987 Consent Judgment, Para.66 at p.54).

This Financing Plan is also a comprehensive document. It provides for a complex web of rights, duties and relationships between the Downriver communities and Wayne County. It includes approval of project plans for the 1994 improvements (Financing Plan at p.7), Wayne County's right of way to use Downriver communities' public lands (*id.* at 9), Wayne County's duty to plan and construct Local Jurisdiction Improvements (*id.* at 10), and the required method of payment of Judgment (*id.* at 10).

Since the parties entered into the original Financing Plan, it has been necessary to supplement and revise its terms in order that the Plan reflect the actual costs of the projects involved. To date, defendants have submitted fourteen financial supple-

---

6. These bypass gates were ordered closed in October 2002. See Oder Denying Motion to Allow Bypass, September 24, 2002.

7. See Wayne County Downriver Collection System: State Revolving Loan Fund Project Plan, revised May 1, 1993; Wayne County

Downriver Collection System: Project Plan Update for Fiscal 1999.

8. See Table II–11 in the Wayne County Downriver Collection System: Project Plan Update for Fiscal 1999, pp.2–70 (Exhibit O).

ments upon which orders have been entered.[9]

In the Financing Plan, I also retained jurisdiction over any possible disputes "which may arise which may involve the interpretation of the terms of this 1994 Financing Plan and Final Judgment or affect the rights of any party arising out of this 1994 Financing Plan and Final Judgment." My Order dated May 12, 1994 empowered me to "enjoin the parties and their citizens from instituting, appearing in or carrying on any litigation or any administrative proceeding in any court, tribunal, or administrative agency which would have the effect of preventing or delaying compliance with the 1994 Financing Plan and Final Judgment."

In accordance with my retention of jurisdiction, and the necessary oversight mandated by any Consent Judgment, the Consent Judgment and its Financing Plan have been constantly monitored by this court. I am intimately involved in its crafting and design from its from its first proposal on February 22, 1994, to its implementation on May 12, 1994. On January 31, 1995, I denied a motion for reconsideration of the Consent Judgment. (*See* Opinion and Order Denying Motion for Reconsideration of Order by United States, Docket No. 194, January 31, 1995).

The 1994 Consent Judgment has been amended twice. Of significance is the First Amendment, filed October 28, 1997, which provided for an upgrade of the Wyandotte Treatment Plant, a regional storage and transport system, and the Second Amendment, filed October 16, 1998, provided for further fine-tuning of the 1994 Consent Judgment.

The 1994 Consent Judgment and its companion, the 1994 Financing Plan, serve as a comprehensive vehicle to bring the Downriver communities and Wayne County into compliance with state and federal environmental laws. To date, the defendants have spent $289,890,000 to comply with the terms of that Consent Judgment.

### D. 2000 Rainstorm and the Ensuing Litigation

On September 11 and 12, 2000, it was reported that a 100–year rainstorm overwhelmed the capacity of the Downriver Sewer System. The basements of approximately 13,000 homeowners became flooded in areas of the Downriver communities. The affected homeowners (basement flooding plaintiffs) and, where applicable, their insurance companies, have sued their respective cities, Wayne County, or both for this flooding event in thirty-four proposed class action lawsuits, claiming that the improper operation of the sewer system by the defendants caused damage to their properties.

9. See Stipulation and Order regarding Supplement # 2, March 17, 1995; Stipulation and Order regarding Supplement # 3, August 23, 1995; Supplemental # 4 to Downriver Sewage Disposal System Financing Plan and Final Judgment, July 3, 1996; Supplemental # 5 to Downriver Sewage Disposal System Financing Plan and Final Judgment, July 3, 1996; Stipulation and Order regarding Supplement # 6, October 1, 1996; Stipulation and Order regarding Supplement # 7, March 21, 1997; Supplemental # 8 to Downriver Sewage Disposal System Financing Plan and Final Judgment, June 24, 1997; Supplement # 9 to Downriver Sewage Disposal System Financing Plan and Final Judgment, August 26, 1997; Supplement # 10 to Downriver Sewage Disposal System Financing Plan and Final Judgment, September 25, 1998; Supplement # 11 to Downriver Sewage Disposal System Financing Plan and Final Judgment, February 4, 1999; Supplement # 12 to Downriver Sewage Disposal System Financing Plan and Final Judgment, May 24, 1999; Supplement # 13 to Downriver Sewage Disposal System Financing Plan and Final Judgment, August 20, 1999; Supplement # 14 to Downriver Sewage Disposal System Financing Plan and Final Judgment, February 11, 2000.

In turn, some of the city defendants cross claimed or filed third-party complaints against Wayne County claiming that Wayne County may be responsible for the flooding and should indemnify them or contribute to any damages that they may be forced to pay to the plaintiffs.

Wayne County removed these cases to this court, alleging that the claims of the cities against it gave rise to federal subject matter jurisdiction under the 1987 Consent Judgment. In turn, plaintiffs filed motions for remand, contending that this court lacked federal subject matter jurisdiction.

I held that federal subject matter jurisdiction existed over cases in which Wayne Count was named a third-party defendant because (1) original jurisdiction existed over the third-party claims against Wayne County; (2) supplemental jurisdiction existed over the original actions against the cities; and (3) the All Writs Act conferred federal subject matter jurisdiction. *See In re Bray* Opinion and Order (May 21, 2001) (Exhibit H).

### E. *Plaintiffs' Mandamus Petition*

Plaintiffs then filed a petition for mandamus to the U.S. Court of Appeals for the Sixth Circuit. The Sixth Circuit denied plaintiffs' petition, holding that "The complaint against Wayne County [by the City of Allen Park] arises from obligations established in a consent decree entered in a case initiated under federal statute." *In re Bray,* No. 01–1241, slip op. at 4 (6th Cir. Aug. 3, 2001) (Exhibit I).

### F. *Declaratory Judgments*

Wayne County also filed a motion for declaratory judgment in the 1987 case, based on the Consent Judgment resulting from that case and asked this court to "declar[e] the rights, responsibilities, liabil-

ities and legal relationships between the parties in this action [ ] and the 1962 Contract as amended [ ] between Wayne County and Downriver Communities with regard to the Downriver Sewage Disposal System and with regard to sewer backups which have periodically caused basement flooding in the Downriver Communities." Mot. for Decl. J., Wayne County (Oct. 25, 2000) (citations omitted). Since the basement flooding plaintiffs' cases would be affected by the outcome of the motion for a declaratory judgment, I ordered them joined to the 1987 case and Consent Judgment under Rule 19 of the Federal Rules of Civil Procedure. *See* Amended Order As to Joinder of Parties, No. 87–70992 (October 16, 2002). Wayne County subsequently filed a motion for Declaratory Judgment in the 1977 case which led to a second order of joinder.[10] Wayne County's Motion For a Declaration of Rights with Regards to Inkster, Dearborn Heights and Allen Park (October 31, 2002).

The City of Dearborn Heights has also filed a declaratory judgment action. City of Dearborn Heights' Complaint for Declaratory and Injunctive Relief, No. 03–70292 (Jan 23, 2003), seeking similar relief.

The relief requested in the declaratory judgment motion was not limited to the issues presented by the basement flooding cases; it also involved other issues involving my oversight activities stemming from the mandates in the Consent Judgment.

### G. *Certified Question to the Michigan Supreme Court*

I certified this question because Wayne County had "moved for a declaratory judgment in order to determine the extent of liability between the parties to the Consent Judgment and for other relief" and be-

---

**10.** It was discovered that some plaintiffs resided in areas not governed by the 1994 Consent Judgment, but resided in areas governed by the Consent Judgment in a different case,

*United States, et al. v. City of Detroit, et al.* (Case No. 77–71100). Those plaintiffs were joined to that case. See Order as to Joinder of Parties, No. 77–71100 (Nov. 12, 2002).

cause the defendants face extraordinary costs should they be found liable.[11]

That court tentatively accepted the certified question on May 15, 2001 (Exhibit L); but then, on May 21, 2002, it declined to rule on it. It held:

> By order of May 15, 2001, the question certified by the United States District Court for the Eastern District of Michigan was held in abeyance pending the decision in *Pohutski v. City of Allen Park* (Docket No. 116949) and *Jones v. City of Farmington Hills* (Docket No. 117935). On order of the Court, the decision having been issued on April 2, 2002, 465 Mich. 675, 641 N.W.2d 219 (2002) [ (Exhibit N) ], the certified question is again considered and, the subject of such certified question having been addressed in such decision, the Court respectfully declines the request to answer it.

In re Certified Question by the U.S. District Court for the Eastern District of Michigan, No. 118387, Order (Mich. May 21, 2002) (Exhibit M).

### H. *Renewed Motions for Remand*

Plaintiffs contend that recent decisions by the United States Supreme Court (*Syngenta v. Henson*, 537 U.S. 28, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002)) and the Sixth Circuit (*First National Bank v. Curry*, 301 F.3d 456 (2002)) have raised additional questions as to subject matter jurisdiction. I will refer to these contentions later.

### III. HOLDING

This court has subject matter jurisdiction over all cases that have been filed in this court and all cases that have been removed from the Wayne County Circuit Court to this court, and are related to severe wet weather and consequent basement flooding that occurred in the Downriver communities on September 10–12, 2000.

Two grounds that support subject matter jurisdiction are:

### A. *Ground 1*

Thirty-four putative class action cases involving approximately 13,000 individual claims of basement flooding, having been filed in the Wayne County Circuit Court, were removed by either defendant Wayne County or one or more of the defendant cities to this court. When filed, those cases alleged causes of action based on negligence, *strict liability,* gross negligence, trespass/nuisance and unconstitutional takings. Some cases were subrogated claims, other indemnification claims, and several cases claimed that insurers for the cities had not paid claims.

As these events began to unfold, it became clear that a vacuum existed in Michigan law as to municipal immunity when basement flooding occurred. There was a division in the Michigan Supreme Court as to whether the government tort liability act, MCLA § 691.1401 *et seq.,* applied to municipalities and the state alike. *See Li v. Feldt,* 434 Mich. 584, 456 N.W.2d 55 (1990) (Griffin, J. dissenting). Then, too, in *CS & P, Inc. v. City of Midland,* 229 Mich.App. 141, 145, 580 N.W.2d 468 (1998), a state court of appeals held that a trespass/nuisance claim triggered *strict liability* in a basement flooding case. The Michigan Supreme Court declined to grant leave to appeal in that case, 461 Mich. 1005, 610 N.W.2d 872; 2000 WL 558895 (Mich.2000) (Corrigan, J. and Weaver, CJ dissenting). Meanwhile, two circuit courts, in *Pohutski* and *Jones,* (*Pohutski,*

---

11. It is noted that Peter Macuga, plaintiffs' counsel, has already sued without success many of the defendant municipalities regarding the financing of these improvements under the Headley Amendment. *Bylinski v. Allen Park,* 169 F.3d 1001 (6th Cir.1999); *cert. denied,* 527 U.S. 1037, 119 S.Ct. 2396, 144 L.Ed.2d 796 (1999).

No. 222238, Unpublished order (Mich.Ct. App. May 23, 2000); *Jones,* No. 227657, Unpublished order (Mich.Ct.App. September 29, 2000)), also applied strict liability in basement flooding cases. Several defendant cities in this uncertainty entered into settlements with basement flooding plaintiffs.

In the cases that were removed to this court, the defendants, in declaratory judgment motions, claimed that they were absolutely immune from liability because they were engaged in a governmental function in the operation of a complex sewer system. This led me to certify a question to the Michigan Supreme Court:

Whether political subdivisions as defined un the governmental tort liability immunity act, MCLA § 691.1401 *et seq.,* M.S.A. § 3.996(101) *et seq.,* are absolutely immune under the act from tort liability when engaged in the exercise or discharge of a governmental function, except as provided in the five following statutory exceptions: the highway exception, MCLA § 691.1401, M.S.A. § 3.996(102); the motor vehicle exception, MCLA § 691.1405, M.S.A. § 3.996(105); the public building exception, MCLA § 691.1406, M.S.A. § 3.996(106); the proprietary function exception, MCLA § 691.1413, M.S.A. § 3.996(113); and the governmental hospital exception, MCLA § 691.1407(4), M.S.A. § 3.996(107)(4).

*Certification of Question to the Michigan Supreme Court. United States v. Wayne County,* Case No. 87–70992 (E.D.Mich. Jan. 9, 2001) (hereinafter "certified question").

That court tentatively accepted the certified question on May 15, 2001; but then, on May 21, 2002, it declined to rule on it. It held:

By order of May 15, 2001, the question certified by the United States District Court for the Eastern District of Michigan was held in abeyance pending the decision in *Pohutski v. City of Allen Park* (Docket No. 116949) and *Jones v. City of Farmington Hills* (Docket No. 117935). On order of the Court, the decision having been issued on April 2, 2002, 465 Mich. 675, 641 N.W.2d 219 (2002), the certified question is again considered and, the subject of such certified question having been addressed in such decision, the Court respectfully declines the request to answer it.

In re Certified Question by the U.S. District Court for the Eastern District of Michigan, No. 118387, Order (Mich. May 21, 2002).

An analysis of these cases, *Pohutski* and *Jones,* reveals that the Michigan Supreme Court held that the governmental tort liability act:

1. gave immunity to governmental agencies such as cities and counties when engaged in governmental functions;

2. held that the ruling would only be applied prospectively to any cases filed after April 2, 2002;

3. that for cases filed before April 2, 2002, there would only be liability against governmental agencies, such as the defendants here, if a cause of action of trespass/nuisance or unconstitutional taking was proven;

4. that municipalities in such cases were not liable for causes of actions alleging negligence, gross negligence or trespass, and that in no event was there any cause of action based on strict liability; and

5. that only claims for trespass/nuisance survive as set forth in the *Hadfield* case *Hadfield v. Oakland County Drain Comm'r,* 430 Mich. 139, 145, 422 N.W.2d 205 (1988). Additionally, the Court declined to address the issue of unconstitutional takings.

I note, too, that the plaintiffs in their briefs filed with the Michigan Supreme Court sought prospective application of the court's ruling if it found that there is immunity for the defendants.

█ Since this is what the court did, I conclude from its ruling that only a trespass/nuisance [12] or a takings claim is free from the defense of immunity for cases filed before April 2, 2002, and (2) that the court, by *operation of law reformed* the claims of the plaintiffs so that these claims could succeed only on proof of condition, causation and control (the *Hadfield* elements) and the Court, by doing away with strict liability and making the freedom from immunity (to which the defendants would otherwise be entitled), limited to proof of condition, causation and control, ruled that these claims could only be judged based on the conduct of the defendants in the operation of a complex sewer system as required by the Consent Judgments. Thus, the federal question occurs, because of consent judgments under a federal statute, and subject matter jurisdiction is present. No court, be it a federal or a state court, in the light of the ruling of the Michigan Supreme Court, could ignore the Consent Judgments mandated by federal statute.

Since I have original subject matter jurisdiction over plaintiffs' trespass/nuisance claim, I exercise supplemental jurisdiction over plaintiffs' remaining claims under 28 U.S.C. § 1367.

### B. *Ground 2*

Commencing on September 25, 2000, the cases above-referred to began to be filed in the Wayne County Circuit Court. This triggered an immediate response by Wayne County, one of the defendants. Based on the 1987 Consent Judgment, which was approved by this court, and over which this court has continued supervision, Wayne County named as respondents thirteen communities and two drainage districts, which are parties to that Consent Judgment. In its motion for declaratory judgment, Wayne County cited the dispute resolution clause, which mandated that the parties were required to work together to resolve disagreements; and, if unable to do so, to seek resolution in this court.

Wayne County's statement as to the relief requested reads:

Should this Court exercise its sound discretion to enter an order declaring the rights, responsibilities, liabilities and legal relationships between the parties to the Downriver Case over which this Court has retained jurisdiction and which arise out of this Court's prior orders, judgments and decrees, the 1962 Contract between Wayne County and the Downriver Communities, MDEQ's sewer design standards and sewer approval policies and state tort, contribution, indemnity, constitutional and any other applicable law with regard 1) to operation of the Downriver Sewer System during wet weather events when floods and sewer backups occur and 2) *to the liability, if any, which Wayne County or parties in this case may have for damage claims arising out of flooding and sewer backups?* (Emphasis added)

Wayne County's Brief in Support of its Motion Requesting Declaratory Judgment, i (October 25, 2000).

█ Clearly, this court has jurisdiction as to this issue and, since resolution of this issue would directly affect the cases filed by the plaintiffs, this court entered Rule 19 Orders of Joinder as to all cases which had been filed in the Wayne County Circuit

---

**12.** At the time of the writing of this Opinion, it is not clear as to whether the Court's holding in *Pohutski* and *Jones* applies to the cases before me.

Court and removed to this court. Having original jurisdiction over these disputes between the cities and the County as to this liability, if any, as alleged in the basement flooding plaintiffs' suits, and through the Rule 19 Orders of Joinder, I asserted jurisdiction over these underlying basement flooding cases under the Supplemental Jurisdiction statute, 28 U.S.C. § 1367. This triggered plaintiffs' petition for a writ of mandamus.

In its Order denying that petition for a writ of mandamus, the U.S. Court of Appeals for the Sixth Circuit stated: "The complaint against Wayne County [by the City of Allen Park] arises from obligations established in a consent decree entered in a case initiated under federal statute." *In re Bray, et al.*, Case No. 01–1241, at 4, (Aug. 3, 2001).

Thus, for these reasons, this court has original subject matter jurisdiction over all basement flooding cases on Grounds 1 and 2 hereinbefore set forth.

## IV. ANALYSIS

■ Federal courts are courts which may exercise only those powers authorized by Constitution and federal statute. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375, 377, 114 S.Ct. 1673, 128 L.Ed.2d 391 (1994). Removal from a state court to a federal court is governed by 28 U.S.C. § 1441, which permits the removal of any civil action brought in a state court "of which the district courts of the United States have original jurisdiction." In other words, the proper question is whether this case could have been brought in the federal court in the first place. *Strong v. Telectronics Pacing Systems, Inc.*, 78 F.3d 256 at 258 (6th Cir.1996).

As set forth in Sec. III, *Holding, infra*, there are two grounds for original subject matter jurisdiction. First, since the resolution of basement flooding plaintiffs' state law causes of action turns necessarily on the interpretation of the two federal court Consent Judgments, I have original federal jurisdiction in those cases. Second, since I have original jurisdiction over the declaratory judgment actions filed by Wayne County and Dearborn Heights, and the state law claims have been joined to the 1987 and 1977 cases, respectively, I have supplemental jurisdiction over the basement flooding plaintiffs and their claims.

A. *Plaintiffs' State Law Claim of Trespass/Nuisance Requires Interpretation and Resolution of Defendants' Duties under the Consent Judgment*

Under 28 U.S.C. § 1331 [13] and the well-pleaded complaint rule, a case "arises under" the laws of the United States if, on the face of the complaint, a federal issue is raised. *Louisville & Nashville Railroad v. Mottley*, 219 U.S. 467, 31 S.Ct. 265, 55 L.Ed. 297 (1911). If plaintiff's causes of action are based on state law, the case nevertheless " 'arise[s] under' the laws of the United States if a well-pleaded complaint established that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties." *Franchise Tax Bd. v. Laborers Vacation Trust*, 463 U.S. 1 at 13, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983).

While basement flooding plaintiffs' original pleadings alleged various state law causes of action, the Michigan Supreme Court's decision in *Pohutski, et al. v. City of Allen Park, et al.* and *Jones, et al. v. City of Farmington Hills, et al.*, 465 Mich. 675, 641 N.W.2d 219 (2002), held that the only viable claims remaining against the

---

**13.** The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States. 28 U.S.C. § 1331

Downriver communities are based on trespass/nuisance and unconstitutional takings. Therefore, the Court ruled that plaintiffs must show condition, causation and control, and it is this necessity that directly implicates the Consent Judgments and triggers federal subject matter jurisdiction.[14]

### 1. Trespass/Nuisance

■ Under Michigan law, trespass/nuisance is "a direct trespass upon, or the interference with the use or enjoyment of, and that results from a physical intrusion caused by, or under the control of, a governmental entity." *Hadfield v. Oakland County Drain Comm'r*, 430 Mich. 139, 145, 422 N.W.2d 205 (1988). To prevail on a cause of trespass/nuisance, a plaintiff must show: (1) condition (nuisance or trespass); (2) cause (physical intrusion); and (3) causation or control (by government). *Id.* The third element of plaintiffs' prima facie case, "causation or control," directly implicates the Consent Judgments.

### a. Causation

■ Causation under trespass/nuisance means proximate cause. *Peterman v. Dep't of Natural Resources*, 446 Mich. 177, 205 n. 42, 521 N.W.2d 499 (1994). Under Michigan law, proving proximate cause entails proof of two separate elements: (1) cause in fact and (2) legal cause. *Helmus v. Transportation Dep't.*, 238 Mich.App. 250, 255, 604 N.W.2d 793 (1999). Cause in fact is defined as "but for

causation." In other words, "but for" the defendant's actions, plaintiff's injuries would not have occurred. On the other hand, legal cause is that which operates to produce particular consequences without the intervention of any independent, unforseen cause, without which the injuries would not have occurred. *Ross v. Glaser*, 220 Mich.App. 183, 192–193, 559 N.W.2d 331 (1996).

In this case, plaintiffs must establish that "but for" the defendant's[15] acts, their injuries would not have occurred. This can only be answered by recourse to the Consent Judgments. The Consent Judgments delegate specific duties to both to DWSD and Wayne County and each of the Downriver communities, and once plaintiffs identify the condition of trespass/nuisance, they must then prove who was responsible for that act. Given the complex web of duties and relationships under the Consent Judgments, plaintiffs cannot bypass this issue. Indeed, the only way plaintiffs can bypass an interpretation of the Consent Judgments is if they rely on the theory of *res ipsa loquitur* or joint and several liability, which do not require a plaintiff to pinpoint a specific wrongdoer. Neither theory applies here.

### b. Control

■ Under the *Hadfield* trespass/nuisance exception to governmental immunity, "[c]ontrol may be found where the defendant creates the nuisance, owns or

---

**14.** Plaintiffs contend that removal is only proper when jurisdiction existed at the time of removal. This argument is misleading. While removal on the basis of diversity of jurisdiction requires that complete diversity existed at the time of removal (see, e.g., *Jerome–Duncan, Inc. v. Auto–By–Tel, L.L.C.*, 176 F.3d 904, 907 (6th Cir.1999) (holding that in order for a defendant to remove a case to federal court based upon diversity jurisdiction, there must be complete diversity of citizenship both at the time that the case is commenced and at the time that the notice of removal is filed)), there is no such requirements for removal based on federal question jurisdiction. In any event, since the *Pohutski* decision held that *Hadfield* applies to these cases, the elements of the trespass/nuisance exception remained the same as the time when Wayne County removed these cases to this court. Thus, the grounds for federal subject matter jurisdiction existed at the time of removal.

**15.** i.e., the named defendant on the face of the original complaint.

controls the property from which the nuisance arose, or employs another to do work that he knows is likely to create a nuisance." *Baker v. Waste Management of Michigan,* 208 Mich.App. 602, 606, 528 N.W.2d 835 (1995) (citation omitted). To demonstrate control through ownership, a governmental entity defendant must possess title to the property in question. *Continental Paper & Supply Company v. Detroit,* 451 Mich. 162, 166, 545 N.W.2d 657 (1996).

In the event that a defendant does not have ownership of the property, the "control" element is only satisfied if defendant exercises "a level of absolute control" such as when "the owner or possessor of land turns over the entire charge of the land [to the defendant]." *Continental Paper* at 166, 545 N.W.2d 657 (quoting 2 Restatement of Torts, 2d, § 387).

In *Continental Paper,* an arsonist set fire to an abandoned warehouse complex and burned down plaintiff's building. The title to the abandoned warehouse was vested in the State of Michigan as a result of unpaid taxes. Before the fire, the City of Detroit had begun taking steps to have the buildings condemned and demolished because it deemed the warehouse a "fire hazard," but never retained title. Plaintiff brought suit against the City of Detroit under trespass/nuisance. It argued that Detroit had "control" over the warehouse because, first, "as a matter of reality," the city had control of the warehouses and, second, because the city had begun taking steps to demolish the warehouses. The Michigan Supreme Court rejected both arguments. First, it held that to demonstrate "control" through ownership, defen-

dant must have title to the property. *Id.* at 166, 545 N.W.2d 657. Second, it held that Detroit did not exercise a level of absolute control over the property to satisfy the "control" element because "at no point did [the City of Detroit] lease the property, collect rent, exclude people from the property, or invite them onto it." *Id.* at 168, 545 N.W.2d 657.

Therefore, in the original complaint, the control element requires the resolution of the question whether the defendant(s) controls the sewage system.

The resolution of this question turns squarely on the interpretation of the Consent Judgments. The Consent Judgments govern the relationship between the Downriver communities, DWSD and Wayne County in the ownership and operation of the sewer system.[16] For example, the 1994 Consent Judgment governs the effect of a sale or transfer of the Downriver Collection and Treatment System (Consent Judgment at 5). It outlines the division of responsibilities between the Downriver communities and Wayne County. (Consent Judgment at 48). In carrying out the requirements of the Consent Judgment, the Financing Plan further lays out the interwoven relationship between the Downriver communities and Wayne County in the construction and operation of the improvements. Wayne County is ordered to "plan, design, acquire and construct the 1994 improvements on behalf of the Downriver Communities and Wayne." (Financing Plan at 9–10). The Downriver communities were ordered to "operate, maintain, and administer its Local Jurisdictional Improvements as part of its local sewage

---

**16.** For this jurisdictional inquiry, it is sufficient at this point to recognize that the resolution of whether the Downriver communities satisfy the "causation or control" element turns on the responsibilities given to the Downriver communities and Wayne County by the Consent Judgment. It is unnecessary at this point to resolve the question of whether the Downriver communities or Wayne County had control of the sewer system or who, if any, caused the basement floodings. Those questions will be resolved under appropriate motions for summary judgment.

disposal system and pay all costs thereof, so as to keep all such facilities in proper repair and working order in compliance with all applicable federal, state, and local regulations." (Financing Plan at 10). Wayne County is ordered to apportion the cost of the improvements among each locale. (Financing Plan at 11).

### 2. *Merrell Dow Pharmaceuticals, Inc. v. Thompson*

*Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986), is inapplicable to this case. In *Merrell Dow*, foreign plaintiffs brought state law products liability actions against defendant Merrell Dow, alleging that Merrell Dow violated the Federal Food, Drugs, and Cosmetics Act by misbranding the drug Bendectin and was therefore negligent under state law. Defendants removed the case to federal court based on a claimed federal question. The Supreme Court disagreed, reasoning that if Congress intended to vest federal jurisdiction through the statute, it would have provided for a private cause of action in order to vindicate that right. Thus, it held that the alleged federal violation must itself have a private cause of action in order to trigger federal subject matter jurisdiction.

In *Merrell Dow*, the alleged federal issue was a violation of federal law. The federal issue in this case is fundamentally different. The federal issue in this case is the legal relationship between co-defendants in a Consent Judgment arising from a federal Clean Water Act enforcement action by the EPA. Vesting federal jurisdiction in cases that allege a violation of federal law, but where Congress did not create a private a cause of action, would circumvent congressional intent of not creating a federal right. However, the question here is not the vindication of a federal right or a violation of federal law. Rather, it is the interpretation of the parties' legal relationship under federal Consent Judgments. Thus, *Merrell Dow* is not dispositive.

### 3. *First National Bank v. Curry*

Plaintiffs contend that the Sixth Circuit's recent decision in *First National Bank v. Curry*, 301 F.3d 456 (6th Cir. 2002), bars the removal of this case to this court. This argument is without merit. In *Curry*, the First National Bank brought state action claims against its former executive for operating a check-kiting scheme. The defendant former executive impleaded third-party bank officers for violation of federal banking laws. The third-party defendant then removed the case to federal court on the basis of the federal banking laws. The Sixth Circuit reversed the removal, holding that (1) under 28 U.S.C. § 1441(a),[17] a third-party defendant is not a "defendant" within the meaning of the statute and cannot remove a case to federal court; it also held that (2) under 28 U.S.C. § 1441(c),[18] a third-party claim cannot be the basis for federal jurisdiction because it is not "joined" to the original claims under the statute. Plaintiffs argue that since Wayne County is a third-party

---

17. "Except as otherwise expressly provided by Act of Congress, any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants to the district court of the United States for the district and division embracing the place where such action is pending ...." 28 U.S.C. § 1441(a).

18. "Whenever a separate and independent claim or cause of action within the jurisdiction conferred by section 1331 of this title is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates." 28 U.S.C. § 1441(c).

defendant in these cases, it cannot effectuate the removal based on the third-party complaints.

The proper removal of these cases is grounded in the original complaints through 1441(c). "The difference between the two provisions in this respect is that § 1441(c), unlike § 1441(a), does not include the phrase 'the defendant or the defendants.'" *Id.* at 464. In other words, based on the plain language of the statutes, there is no restriction as to who may remove under § 1441(c). Therefore, Wayne County's label as a "third-party defendant" does not defeat Wayne County's removal to this court.

Moreover, unlike *Curry*, the trespass/nuisance claim in this case is properly "joined" because it is part of the plaintiffs' *original* complaint against the *original* defendants. It is not part of the third-party complaint, as in *Curry*. Therefore, *Curry* is not dispositive here and the removal was proper.

Plaintiffs further contend that the Consent Judgments can only be raised in these cases as a federal defense. This is nonsense. As I have demonstrated, plaintiffs' *prima facie* case under the theory of trespass/nuisance requires them to affirmatively establish the element of "cause or control." These are not anticipations of federal defenses, but an essential part of plaintiffs' burden of proof.

Therefore, since the resolution of the "cause and control" elements turn on the resolution of federal law, as mandated by the Consent Judgments, a federal question appears on the face of the complaint and this court has original jurisdiction over those claims.

### 4. *Supplemental Jurisdiction*

Title 28 U.S.C. § 1367(a) states that "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy...." As discussed *supra*, I have original jurisdiction over plaintiffs' state law claim of trespass/nuisance. Plaintiffs' remaining claim of unconstitutional takings arises out of the same natural wet weather event as their trespass/nuisance claim. Therefore, the claims derive from a common nucleus of operative facts and constitute one constitutional "case," and I have power to exercise supplemental jurisdiction over the remaining state claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In order to fulfill Congress' concerns of judicial economy and avoidance of piecemeal litigation, I hereby exercise supplemental jurisdiction over plaintiffs' remaining claims.

### B. *Alternate Grounds for Jurisdiction: Original Jurisdiction over the Declaratory Judgment Actions and Supplemental Jurisdiction over the State Law Claims*

### 1. *Original Jurisdiction over Wayne County's Declaratory Judgment Motion*

The Consent Judgments give me jurisdiction over the various declaratory judgment actions/motions. Thus, I exercise supplemental jurisdiction over the basement flooding plaintiffs and their state court claims.

Consent judgments are not merely voluntary private agreements approved with a judicial stamp. Instead, they are final judgments of the court and carry the full force of law. The force of a Consent Judgment is settled within our judicial system:

> It is a contract between the parties to the agreement, operates as an adjudication between them and, when the court gives the agreement its sanctions, becomes a judgment of the court. The fact that the judgment is by consent

gives it neither greater nor less force than if rendered after protracted litigation. It has the same weight and effect as any other judgment and, unless vacated or set aside, stands as a final determination of the rights of the parties.

Black's Law Dictionary 842(6th Ed.1990) (quoting *Traveler's Ins. Co. v. United States*, 283 F.Supp. 14, 28 (S.D.Tex.1968) (internal citations omitted)).

■ Therefore, in order to enforce the laws of the United States, the All Writs Act confers on courts the power to bind non-parties in enforcing its judgments. *See United States v. New York Telephone*, 434 U.S. 159, 98 S.Ct. 364, 54 L.Ed.2d 376 (1977); *Pennsylvania Bureau of Correction v. United States Marshals Service*, 474 U.S. 34, 106 S.Ct. 355, 88 L.Ed.2d 189 (1985). Moreover, the Sixth Circuit has held that district courts "have a duty to enforce, interpret, modify, and terminate their consent decrees as required by the circumstances." *Waste Management of Ohio, Inc., v. City of Dayton*, 132 F.3d 1142, 1146 (6th Cir.1997) (internal citation omitted). Thus, a federal court has inherent jurisdiction over its judgments that have a prospective effect. *Id.* at 1145. The United States Court of Appeals for the Sixth Circuit best summarized this power when it stated:

> Even if the consent decree does not expressly grant the district court jurisdiction to modify the decree, it is well settled that "courts retain the inherent power to enforce agreements entered into in settlement of litigation pending before them."

*Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir.1994).

In this case, the Consent Judgments to which the Downriver communities, DWSD and Wayne County are parties provide that this court has jurisdiction over the parties and the subject matter of their action, as provided in the Clean Water Act, 33 U.S.C., § 1319. Paragraph 66 of the 1994 Consent Judgment provides that the court shall retain jurisdiction for the purpose of ruling on any motion by the parties to enforce the terms and conditions of this judgment under applicable law. Paragraphs 41 and 42 provide that disputes between the parties are to be resolved ultimately by the court.

As hereinbefore recited, commencing on September 25, 2000, the above-referred-to cases began to be filed in the Wayne County Circuit Court, which triggered an immediate response by Wayne County, one of the defendants. Based on the 1987 Consent Judgment, which was approved by this court, and over which this court has continued supervision, Wayne County named as respondents thirteen communities and two drainage districts, which are parties to that Consent Judgment. In the motion for declaratory judgment, Wayne County cited the dispute resolution clause, which mandated that the parties were required to work together to resolve disagreements; and, if unable to do so, to seek resolution in this court.

Wayne County's statement as to the relief requested reads:

> Should this Court exercise its sound discretion to enter an order declaring the rights, responsibilities, liabilities and legal relationships between the parties to the Downriver Case over which this Court has retained jurisdiction and which arise out of this Court's prior orders, judgments and decrees, the 1962 Contract between Wayne County and the Downriver Communities, MDEQ's sewer design standards and sewer approval policies and state tort, contribution, indemnity, constitutional and any other applicable law with regard 1) to operation of the Downriver Sewer System during wet weather events when

floods and sewer backups occur and 2) *to the liability, if any, which Wayne County or parties in this case may have for damage claims arising out of flooding and sewer backups?* (Emphasis added) Wayne County's Brief in Support of its Motion Requesting Declaratory Judgment, i (October 25, 2000).

The Consent Judgments clearly give me jurisdiction to resolve the declaratory judgment actions/motions. Plaintiffs contend that the Declaratory Judgment Act, 28 U.S.C. § 2201, does not confer independent grounds for jurisdiction. *See Michigan Savs. & Loan League v. Francis,* 683 F.2d 957, 960 (6th Cir.1983). However, jurisdiction over the declaratory judgments does not rest on the Declaratory Judgment Act. Instead, my jurisdiction over the declaratory judgments is based on the Consent Judgment provisions which provide that jurisdiction over disputes between the parties to the Consent Judgment is vested in this court.

Plaintiffs also cite *City of Saginaw v. Service Employees Intern'l Union, Local 446–M,* 720 F.2d 459, 461 (6th Cir.1983), for the proposition that declaratory judgments that seek to assert a federal defense in anticipation of a state law cause of action does not give rise to *federal* jurisdiction. However, Wayne County's declaratory judgment was filed in anticipation of the cities' claims against Wayne County *under the Consent Judgment* and not under state law. Thus, *City of Saginaw* is not applicable to Wayne County's declaratory judgment motions and does not defeat this court's jurisdiction over the declaratory judgment motions.

I note that the plaintiffs make much of the labels that are attached to the various actions involving removal in which the parties were engaged. Labeling of these removal actions, while not unimportant, is misleading, if not understood. What is paramount in all of the activity of the

defendants (cities and County) is that they were sued because of their conduct in operation of the sewer system, which system was authorized and controlled by the Consent Judgment. The suits are attacks on the conduct of the defendants in the operation of the system defined in the Consent Judgments.

2. *Pendent Party Jurisdiction (Supplemental Jurisdiction) Over the Basement Flooding Plaintiffs*

Since I have original subject matter jurisdiction over the motions for Declaratory Judgment filed by Wayne County and the action for declaratory judgment filed by Dearborn Heights, I exercised pendent party jurisdiction over all basement flooding plaintiffs through joinder orders dated October 16 2002, and November 12, 2002.

Pendent party jurisdiction is a subcategory of supplemental jurisdiction. It is "the authority of the federal court to hear claims against additional parties, over which it would not otherwise have jurisdiction, because those claims arise from a common nucleus of operative facts." *Chemerinsky,* Federal Jurisdiction at 336 (Aspen, 3rd ed.1999). Stated differently, "if a plaintiff presents a federal question and another possible plaintiff presents a state law claim arising from the same set of facts, [whether] the federal court [can] entertain the latter suit." *Id.*

In 1990, Congress drafted 28 U.S.C. § 1367(a), the supplemental jurisdiction statute, to include pendent party jurisdiction. In *Finley v. United States,* 490 U.S. 545, 109 S.Ct. 2003, 104 L.Ed.2d 593 (1989), the Supreme Court held that although the Constitution allows for pendent party jurisdiction, Congress had not conferred pendent jurisdiction through the Federal Tort Claims Act. *Id.* at 555, 109 S.Ct. 2003. In response, the Federal Court Study Committee recommended Congress to supersede *Finley* by confer-

ring pendent party jurisdiction to conserve judicial economy by providing a single forum for matters arising out of the same transaction or occurrence. Federal Court Study Committee Report (April 2, 1990). Congress adopted the recommendation, and 28 U.S.C. § 1367(a) expressly provides that "supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." *Id. See also Musson Theatrical Inc. v. Federal Ex. Corp.,* 89 F.3d 1244, 1254 (6th Cir. 1996) (recognizing that *Finley* had been superseded by 28 U.S.C. § 1367(a)).

In my orders of joinder, I joined the basement flooding plaintiffs to both the 1977 case and 1987 case, respectively. I held that:

> Since the declaratory judgment seeks to declare the cities' and Wayne County's rights and responsibilities for basement floodings under the [1987 Case] Consent Judgment, the absence of the basement flooding plaintiffs in the declaratory judgment action would deprive basement flooding plaintiffs of their due process rights to protect their interest in the litigation. *See Intercept Sec. Corp. v.Code–Alarm, Inc.,* 164 F.R.D. 215, 218 (E.D.Mich.1995) ("to impair or impede interest under Rule 19(a)(2)(i), final decree must leave controversy in such condition that its final determination is inconsistent with equity and good conscience."). Therefore, they are necessary parties under Fed.R.Civ.P. 19(a)(2)(i).

Amended Order As to Joinder of Parties at 5 (October 16, 2002).[19]

Since the declaratory judgment actions all arise out of the 2000 rainstorms, they arise out of a common nucleus of operative facts as the state law claims brought by the basement flooding plaintiffs. More-

over, providing a single forum for this massive litigation would further Congress' policy concern for approving pendent party jurisdiction in the first place—conserve judicial economy.

Accordingly, I properly exercised supplemental jurisdiction over the basement flooding plaintiffs and their state court claims.

### C. *Syngenta v. Henson*

In *Syngenta v. Henson,* 537 U.S. 28, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002), the Supreme Court held that the All Writs Act does not independently give rise to federal subject matter jurisdiction. In the two grounds for jurisdiction stated *supra,* I do not rely solely on the All Writs Act as grounds for federal subject matter jurisdiction. Accordingly, *Syngenta* is not dispositive to the grounds for federal subject matter jurisdiction in this case.

### D. *Additional Policy Concerns*

Another concern must be noted here. Given the comprehensive scope of these Consent Judgments, how can a state court decide these legal issues without interpreting the federal Consent Judgments? This is what the mandamus panel of the Sixth Circuit meant when it stated, "We will not use mandamus authority to direct a remand to state court that would simply result in a removal back to federal court." *In re Bray Order* at 4 (01–1241) (Aug. 3, 2001).

The need for uniform interpretation of these federal Consent Judgments under the Clean Water Act is overwhelming. The Consent Judgments govern the sewage system of Southeast Michigan and the enforcement of the Clean Water Act. Uniform interpretation is vital to their success. The Consent Judgments specifically

---

**19.** I made a similar finding regarding the 1977 Case Consent Judgment in Order As to Joinder of Parties (November 12, 2002).

provide a dispute resolution provision to safeguard uniform interpretation and integrity.

Moreover, this court is in a unique position to interpret the complexities and nuances of the Consent Judgments. I have overseen the prosecution of Clean Water Act cases in Southeast Michigan since 1977 and have been intimately involved in protracted negotiations and continued enforcement of these Consent Judgments over many years.

## V. DOCUMENTS

Numerous references in this Opinion are made to documents. They are:

| | |
|---|---|
| Exhibit A | Original 1977 Case Consent Judgment (1977) |
| Exhibit B | Amended 1977 Case Consent Judgment (1980) |
| Exhibit C | Memorandum Opinion and Order, No. 77–71100 (Nov. 7, 1989) |
| Exhibit D | Second Amended 1977 Case Consent Judgment (2000) |
| Exhibit E | Downriver Sewerage Disposal Contract (1962) |
| Exhibit F | 1987 Case Consent Judgment (1994) |
| Exhibit F(a) | First Amendment to 1987 Case Consent Judgment (Oct. 28, 1997) |
| Exhibit F(b) | Second Amendment to 1987 Case Consent Judgment (Oct. 16, 1998) |
| Exhibit G | 1987 Case Financing Plan (1994) |
| Exhibit H | *In re Bray* Opinion, no. 00–74510 (May 21, 2001) |
| Exhibit I | *In re Bray* Order denying Plaintiffs' Mandamus Petition (Aug. 3, 2001) |
| Exhibit J | Wayne County's Motion for Declaratory Judgment (Oct. 25, 2000) |
| Exhibit K | Certified Question to Michigan Supreme Court |
| Exhibit L | Michigan Supreme Court's Order accepting certified question |
| Exhibit M | Michigan Supreme Court's Order rejecting certified question |
| Exhibit N | *Pohutski, et al. v. City of Allen Park, et al.* and *Jones, et al. v. City of Farmington Hills, et al.*, 465 Mich. 675, 641 N.W.2d 219 (2002) |
| Exhibit O | Wayne County Downriver Collection System Project Plan Update For Fiscal 1999 (May 1998) |

Rather than to attach with this Opinion each of these exhibits, the court has made a special file of them, located in my chambers. Access to these documents will be made immediately available to any interested counsel or party.

## VI. CONCLUSION

For these reasons, plaintiffs' motions for remand for lack of subject matter jurisdiction are hereby DENIED.

IT IS SO ORDERED.